The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the deputy commissioner. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the deputy commissioner and enters the following Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the deputy commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the North Carolina Workers' Compensation Act at the time of the plaintiff's alleged injury.
2. The employer-employee relationship existed between plaintiff and defendant-employer at the time of plaintiff's alleged injury.
3. Travelers Insurance Company was the carrier on the risk at the time of the alleged injury.
4. The average weekly wage of the plaintiff will be determined by a properly executed Form 22 wage chart to be provided by the employer.
5. The parties agree that the issues to be addressed by the Commission are whether plaintiff-employee suffered an injury by accident or occupational disease on July 5, 1993, and if so, what are the compensable consequences.
 ***********
Based upon the competent evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a male who was 61 years of age on the date of the hearing before the deputy commissioner. Plaintiff began working for defendant Sandoz Chemical Corporation in 1985 and was a boiler operator at the time this claim arose.
2. Once a year, usually the first of July, the plant would be shut down for the repair and cleaning of the cooling towers. Plaintiff would help with the cleaning and maintenance, which was not part of his normal duties as a boiler operator.
3. On the afternoon of July 4, 1993, plaintiff was involved in cleaning sludge out of a pit at the base of Tower 16. The pit was a below-ground area approximately 11 feet wide, sixteen feet in length and 7 feet, 10 inches deep. Sludge and other deposits from the water had settled at the bottom of the pit which had not been cleaned out in at least a year.
4. According to Lloyd Stanley Gann who was plaintiff's supervisor in July, 1993, water is pumped out of the pit through the piping system into the plant area, and is run through coils or condensers to cool products within the plant. The water returns to the cooling tower where it flows into a sump and then into the pit where the process repeats itself.
5. The pit to Tower 16 where plaintiff worked was an enclosed area with grates on one side. There was only a small opening where fumes could escape. All of the other pits at defendant-employer's plant were open at the top. Plaintiff entered through a "manhole". Approximately eleven inches of sludge had settled at the bottom of the pit. The sludge was a mixture of dead plants (such as algae), bugs chemicals and other things that the fans had pulled in from other areas of the plant. Inside the pit was hot on July 4, 1993. Plaintiff worked in the pit for about 2 to 3 hours. He used a squeegee to loosen and clean the sludge which was then washed down the drain. The only protective clothing the plaintiff was provided was goggles, a hard hat, and steel-toed boots. Plaintiff wore long pants and a short-sleeved shirt.
6. While cleaning the pit, plaintiff encountered two to three thousand chlorine bromide pellets that had settled in the sludge at the bottom of the pit. These chlorine bromide pellets or tablets were washed with water down the drain along with the rest of the sludge during the cleaning process. Toward the end of cleaning the pit, plaintiff began to experience itching and burning of his skin and a headache.
7. After plaintiff cleaned the pit, he complained to his supervisor that his arms and stomach were burning even after he had taken a shower and that he felt ill. He also reported seeing a large number of chlorine bromide tablets at the bottom of the pit. The next day, plaintiff complained to his supervisor and co-workers of having been sick all night with vomiting, headaches and coughing.
8. Although plaintiff reported to his supervisor the next day that he believed his illness was related to working in the pit, no accident report was prepared. Completing an accident report after notice of an injury is not the responsibility of the plaintiff.
9. Defendant-employer had a bonus system that was tied to lost-time accidents. Any lost-time accidents affected everyone's bonus.
10. During the period leading up to July, 1993, Jeff Lanham was employed by defendant-employer as a "water tender" which involved water treatment, including treatment of the water in the pits. He tested water and also placed chemicals in the water. One of the chemicals placed in the water of the pit for Tower 16 was chlorine bromine which was used to kill algae. The usual practice was to insert chlorine bromine tablets or pellets in canisters and then place the canisters into the water. The flow of water across the canisters was suppose to dissolve the chlorine bromide pellets. Defendant-employer had determined that a chlorine residual measurement of .2 would keep algae under control.
11. On a weekly basis and sometimes daily, Jeff Lanham had problems maintaining chlorine at the desired level in the pits, especially in the Tower 16 pit. Prior to July of 1993, defendant-employer resorted to dumping buckets of chlorine bromide tablets into the pit of Tower 16 to maintain the desired .2 chlorine residual measurement. Jeff Lanham dumped 1 to 2 buckets of chlorine tablets directly into the pit of Tower 16 each week. He dumped buckets of chlorine bromide tablets in the pit of Tower 16 a few times during June, 1993. Another approximately 1 buckets of chlorine bromide tablets were placed in canisters and inserted in the pit of Tower 16 weekly. According to Jeff Lanham, the chlorine bromide appeared to dissolve slowly and accumulated at the bottom of the pit of Tower 16 because there was not really a flow process in that pit. It was more like a basin where things settled. Each bucket of chlorine bromide tablets weighed 50 to 60 pounds and contained from 500 to 1,000 chlorine bromide tablets.
12. Chlorine bromide has a powerful odor and the gas fumes generally stay low.
13. Over the next several weeks after cleaning the pit on July 4, 1993, plaintiff experienced breathing difficulty, chest pain, difficulty talking, coughing and quickened fatigue. His supervisor and some co-workers noticed that plaintiff's health appeared to be deteriorating. Plaintiff was assigned lighter duties at work. The plaintiff finally sought medical treatment on July 16, 1993.
14. Dr. Arthur J. Patefield, who is board certified in pulmonary and internal medicine, began treating plaintiff on August 25, 1993. Dr. Patefield determined, even before being told of plaintiff's workplace exposure to chlorine bromide, that his symptoms were consistent with exposure to a chlorine-like compound. One of the reasons Dr. Patefield believed plaintiff had been exposed to a chlorine compound, rather than a more irritant chemical, was that low solubility, small compounds like chlorine can affect small airways without causing irritation to the nasal passages. Plaintiff did not experience any irritation in the nose or mouth as would have been expected with more irritant chemicals.
15. Dr. Patefield did not think plaintiff had chronic lung disease before July 4, 1993. Plaintiff's pulmonary function test were consistent with Dr. Patefield's opinion that plaintiff had been exposed to a chlorine-like material. Dr. Patefield diagnosed plaintiff's condition as "reactive airway disease, secondary to chemical inhalation".
16. Dr. Joanne Pizzino, who is board certified in family and occupational medicine, examined plaintiff at the request of defendant-employer on September 7, 1993. Dr. Pizzino initially diagnosed "chemical inhalation with subsequent persistent respiratory and GI complaints".
17. In October, 1993, Dr. Pizzino changed her diagnosis to reactive airway disease. Dr. Pizzino is not sure why she changed her diagnosis. She could only say that the new diagnosis seems reasonable. Dr. Pizzino's second diagnosis is consistent with that of Dr. Patefield, except for her deleted reference to plaintiff's "chemical inhalation".
18. Dr. Pizzino toured the plant and was shown supposedly an experimental "mock up" of the conditions to which plaintiff was exposed. In the experiment, tablets were placed in large, deep trays filled with water. The trays or bins were covered allowing the tablets to dissolve. The chemicals in the air over the water were then measured.
19. Little weight is accorded the conclusions or opinions of Dr. Pizzino concerning the accuracy of the experiment in measuring the level of chlorine bromide exposure plaintiff likely had while cleaning the pit or the import of the experimental results because there is no evidence presented from which to determine the reliability of the "mock up" experiment in measuring plaintiff's actual exposure level or the validity of the test or experiment.
20. Based upon the contrary testimony of the plaintiff, Lloyd Gann and Jeff Lanham, which is more persuasive, no weight or credibility is accorded the testimony of Kenneth Felton or Bobby Cleveland on the time the pit was cleaned, the number of chlorine bromide tablets in the pit, how much sludge was in the pit, or about what the sludge contained. Kenneth Felton was not in the pit with plaintiff while the pit was being cleaned. Plaintiff was in a better position to observe what was in the pit.
21. Plaintiff continued to work after July 4, 1993 in spite of his physical difficulties, although he missed some days due to illness.
22. On November 15, 1993, Dr. Patefield advised the plant nurse that plaintiff could do work which did not involve exposure to fumes from the brominator. Plaintiff was working full-time at that time. When the plant nurse consulted plaintiff on November 17, 1993 about Dr. Patefield's recommendation, plaintiff expressed concerns about returning to his duties as a water tender and the mechanic work because he knew he was irritable due to inability to sleep and he was afraid of what might happen.
23. Defendant-employer set up an appointment for plaintiff to see Dr. Fitzgerald, a psychiatrist. Dr. Fitzgerald found plaintiff had confusion and memory problems and recommended half-time duties in a non-safety sensitive area with supervision.
24. Defendant-employer opted to give plaintiff medical leave until after his surgery for an unrelated hernia on December 16, 1993. Plaintiff last worked for defendant-employer on or about November 21, 1993.
25. Plaintiff was released to return to work at full duties by Dr. Patefield on February 15, 1994. However, Dr. Fitzgerald would not release plaintiff to return to work at said time.
26. On July 4, 1993, plaintiff was accidentally exposed to large quantities of chlorine bromide, a chemical, while performing job duties assigned by defendant-employer.
27. As a result of his chemical exposure, plaintiff has contracted reactive airway disease, a disabling chronic lung disease. Plaintiff's exposure to chlorine bromide while cleaning defendant-employer's underground pit on July 4, 1993 constituted an interruption of his normal work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Plaintiff thereby sustained a compensable injury by accident arising out of and in the course of his employment.
28. Plaintiff had previously experienced some chest congestion related to the flu in January, 1993, but this condition cleared up with antibiotics. Dr. Pizzino had cleared plaintiff for respirator use at work on July 2, 1993, two days before the incident in question. In order to be cleared for respirator use, Dr. Pizzino performed pulmonary function testing, a physical exam and took a respiratory and cardiovascular history. Plaintiff would not have been cleared if Dr. Pizzino had any significant concerns about his level of pulmonary functioning.
29. The following statement appears to be an indirect credibility finding on the part of the deputy commissioner: "It is not believable to the undersigned that a person so violently ill would not seek medical treatment sooner." Despite the beliefs of the deputy commissioner, the evidence establishes that plaintiff reported itching, burning, and a headache while cleaning the pit; plaintiff reported his symptoms to his supervisor shortly after exiting the pit; plaintiff reported to his supervisor and co-workers the next day that he had been sick the night before and that he thought it was related to cleaning the pit; and plaintiff's condition worsened over time to the point where he finally sought medical treatment on July 16, 1993. Also, the plaintiff was trying to avoid a lost-time accident because it would affect everyone's bonus and he did not think his injury was serious at first. The greater weight of the evidence supports a finding that plaintiff's testimony about how his injury occurred and his resulting physical problems is credible.
30. Plaintiff's major depressive disorder for which he was treated by Dr. Fitzgerald is directly related to his accidental chemical exposure.
31. The parties stipulated that plaintiff's average weekly wage shall be determined from the Form 22 wage chart; however, no Form 22 wage chart has been submitted. Plaintiff is entitled to the maximum compensation rate of 1993 of $442.00 per week.
32. Plaintiff's plant nurse had numerous ex-parte contacts with Dr. Patefield and Dr. Fitzgerald, plaintiff's treating physicians and supplied both doctors with inaccurate and unsubstantiated information in an apparent attempt to influence the opinions of plaintiff's doctors. She informed Dr. Fitzgerald that plaintiff had a pre-existing psychiatric condition and that plaintiff would not get long term disability unless he reversed his opinion and stated that plaintiff's depression was not work related. Dr. Fitzgerald testified that he felt manipulated by Ms. Jones.
33. At the time Dr. Fitzgerald treated plaintiff on October 12, 1995, he was of the opinion that plaintiff was unable to work. Plaintiff has been unable to work since November 21, 1993.
34. As a result of plaintiff's injury and resulting physical and mental disabilities, plaintiff is incapable of returning to work in his prior employment; and considering his age, level of education and past work history, it would be futile for plaintiff to seek employment without vocational rehabilitation assistance.
 ***********
Based upon the foregoing stipulations and findings of fact the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 4, 1993, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. Plaintiff's exposure to an unexpectedly high level of chlorine bromide (gas) during a 2 to 3 hour period while cleaning an underground pit for defendant-employer constituted an injury by accident arising out of and in the course of employment within the meaning of N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's major depressive disorder is directly related to his injury by accident.
3. As a result of plaintiff's accidental exposure to chlorine bromide, he has developed reactive airway disease, a chronic lung disease which has caused plaintiff to become unable to work since on or about November 21, 1993 and continuing. Plaintiff is entitled to temporary total disability compensation at the rate of $442.00 per week from November 21, 1993 through the date of hearing before the deputy commissioner and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29..
4. Defendant is obligated to provide to plaintiff such medical treatment for his chronic lung disease and psychological condition as is reasonably required to effect a cure, provide relief, or would tend to lessen his disability. N.C. Gen. Stat. § 97-25.
5. The deputy commissioner made no specific findings about the credibility of witnesses. Although the Full Commission is not required to do so herein, the Full Commission nevertheless acknowledges that the hearing officer is in the best position to judge the credibility of witnesses. The Full Commission has stated reasons for rejecting the "indirect" or implied credibility finding of the deputy commissioner in its Findings of Fact No. 29.Brown v Family Dollar Distribution Center, (COA 97-306, filed 30 April 1998); Sanders v. Broyhill Furniture Industries,124 N.C. App. 637, 478 S.E.2d 223 (1996).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the maximum compensation rate of $442.00 per week from November 22, 1993 through the date of hearing before the deputy commissioner and continuing until further order of the Industrial Commission.
2. Plaintiff's attorney is awarded a reasonable attorney's fee of twenty-five percent of the amount due plaintiff payable as follows: twenty-five percent of the accrued compensation due plaintiff shall be deducted and paid directly to plaintiff's attorney; thereafter, plaintiff's attorney shall receive every fourth check.
3. Defendants shall pay all medical expenses incurred or to be incurred in the future as a result of plaintiff's compensable injury and psychiatric condition when bills for same have been submitted and approved according to procedures adopted by the Commission.
4. Plaintiff shall cooperate with any vocational rehabilitation assistance provided by defendants.
5. Defendants shall pay the costs due this Commission.
 S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ______________________ DOUGLAS E. BERGER DEPUTY COMMISSIONER
DISSENTING WITHOUT A WRITTEN OPINION:
S/ ______________________ DIANNE C. SELLERS COMMISSIONER